# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| ROBERT ARAGON; DAVID ANTHONY SEGURA; ZACHARY FORT; RICHARD KENNEDY; ROSE'S GUNS & MORE, LLC, a limited liability company; SOUTHWEST GUNSMITH TECHNOLOGIES, LLC, a limited liability company; NEW MEXICO SHOOTING SPORTS ASSOCIATION, a nonprofit corporation; NATIONAL RIFLE ASSOCIATION OF AMERICA, a nonprofit corporation; SECOND AMENDMENT FOUNDATION, a nonprofit corporation; and FIREARMS POLICY COALITION, INC., a nonprofit corporation, <br><br> *Plaintiffs*, <br><br> v. <br><br> MICHELLE LUJAN GRISHAM, Governor of New Mexico, in her official capacity; NEW MEXICO DEPARTMENT OF HEALTH; and KATHYLEEN KUNKEL, Secretary for the New Mexico Department of Health, in her official capacity; J. Does 1–10, <br><br> *Defendants*. | No. 1:20-cv-00325-KK-JHR |

# PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION
# FOR TEMPORARY RESTRAINING ORDER
# AND/OR PRELIMINARY INJUNCTION

## INTRODUCTION

The "constitution [was] intended to endure for ages to come, and consequently, to be adapted to the various *crises* of human affairs." *McCulloch v. State*, 17 U.S. 316, 415 (1819). Indeed, "the forefathers . . . knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring). "[T]hey made no express provision for exercise of extraordinary authority because of a crisis." *Id.* (Jackson, J., concurring). The Constitution's protections remain robust through peace and turmoil. A declaration of emergency does not justify the denial of a natural, constitutionally protected, fundamental right—not even for a limited period of time.

In New Mexico, individuals must generally acquire firearms through a licensed retailer by means of in-person transactions. *See* N.M. Stat. § 30-7-7.1(A). Defendants' Orders have, thus, made it impossible for Plaintiffs, Plaintiffs' members and customers, and similarly situated individuals to purchase firearms during this time of extended insecurity by their Orders and actions shuttering firearms retailers, ranges, and repair facilities and preventing individuals from traveling to and from those businesses. Defendants have used the COVID-19 Novel Coronavirus ("COVID-19") to deprive New Mexicans of their natural and fundamental rights— through executive decree—through their Orders and enforcement actions.

While Defendants may have an interest in reducing the population's exposure to COVID-19, a total ban on the ability of New Mexicans to buy and train with firearms is overbroad, untailored, and categorically unconstitutional. The "enshrinement of constitutional rights necessarily takes certain policy choices off the table." *District of Columbia v. Heller,* 554 U.S. 570, 636 (2008). These include policy choices and orders effecting an absolute prohibition on the exercise of a constitutionally protected right. *Id*. Licensed firearm and ammunition retailers, shooting ranges, and repair facilities are essential businesses—they provide law-abiding individuals with critical access to constitutionally protected property and conduct, and must remain open like other essential businesses.

Times of uncertainty and disturbance are precisely when the right to self-defense is most important. When the Second Amendment was ratified, "Americans understood the 'right of self-preservation' as permitting a citizen to 'repel force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" *Heller*, 554 U.S. at 595 (2008) (quoting 1 BLACKSTONE'S COMMENTARIES 145–46, n.42 (1803)) (brackets omitted). A global pandemic epitomizes a setting in which waiting for "the intervention of society" on one's behalf may be too late.

Through their Orders and enforcement actions, Defendants have implemented a number of broad restrictions that affect both individuals and critically essential small businesses. Defendants' Orders threaten individuals, such as Plaintiffs,

Plaintiffs' members and customers with civil or criminal penalty should they exercise their constitutionally protected rights (and legal obligations) to travel to and use a firearm retailer, range, or repair facility for the lawful acquisition of constitutionally protected items and services for self-defense. Criminalizing going to, coming from, and operating essential businesses that provide access to the constitutionally protected right to keep and bear arms for self-defense—especially in a manner that is inconsistent with other so-called "essential businesses"— cannot withstand constitutional scrutiny. The injunctive relief that Plaintiffs seek through this action is necessary—and immediately so—to uphold this foundational principle of the United States Constitution.

## STATEMENT OF FACTS

### I.   EXECUTIVE ORDERS 2020-004 AND 2020-022 AND THE PUBLIC HEALTH EMERGENCY ORDER AND ENFORCEMENT

On March 11, 2020, in response to the spread of the COVID-19, Governor Michelle Lujan Grisham, purportedly pursuant to the "All Hazard Emergency Management Act, NMSA 1978, §§ 12-10-1 through 12-10-10" and "NMSA 1978, 12-10A-5",[1] issued Executive Order 2020-004, declaring a public health

---

[1] Notably, Section 12-10A-2, specifies that the purpose of the Act is to "provide the state of New Mexico with the ability to manage public health emergencies *in a manner that protects civil rights and the liberties of individual persons*." N.M. Stat. § 12-10A-2(A) (emphasis added).

emergency.[2] On April 6, 2020, Governor Grisham "renewed and extended" Executive Order 2020-004 through April 30, 2020. Executive Order 2020-022 (collectively, "Executive Orders").[3] Executive Order 2020-022 further states that "All other powers invoked, directives, and orders contained in Executive Order 2020-004 remain in effect." On March 23, 2020, Secretary Kunkel issued a Public Health Emergency Order ("Emergency Order", and collectively, with the Executive Orders, "Orders") that closed all non-essential businesses and placed restrictions on mass gatherings.[4] The Emergency Order specifically requires that all non-essential businesses reduce their in-person workforces by 100%. It also "requires the closure of physical . . . retail spaces" of non-essential businesses. There are no exceptions: "All public and private employers are required to comply with th[e] Order." Emergency Order at 5. The Emergency Order does not list lawful firearm retailers, ranges, or repair facilities as "essential businesses."[5]

---

[2] Executive Order 2020-004 is available at https://www.governor.state.nm.us/wp-content/uploads/2020/03/Executive-Order-2020-004.pdf (last visited April 9, 2020).
[3] Executive Order 2020-022 is available at https://www.governor.state.nm.us/wp-content/uploads/2020/04/EO_2020_022.pdf (last visited April 9, 2020).
[4] The Emergency Order is available at https://www.governor.state.nm.us/wp-content/uploads/2020/03/COVID-19-DOH-Order-fv.pdf (last visited April 9, 2020).
[5] The Department of Homeland Security, Cyber-Infrastructure Division ("CISA"), issued updated "Guidance on the Essential Critical Infrastructure Workforce" during the COVID-19 pandemic, which advised that "[w]orkers supporting the operation of firearm or ammunition product manufacturers, retailers, importers, distributors, and shooting ranges" fall squarely within the "critical infrastructure workforce." https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce (last visited April 15, 2020).

The shuttering of firearm retailers goes much further than just eliminating retail sales. With limited exceptions, New Mexico law prohibits private individuals from transferring firearms between themselves, without having a licensed dealer first conduct a federal instant criminal background check. N.M. Stat. § 30-7-7.1(A). Furthermore, federal law generally requires licensed firearm dealers to conduct background checks in person. 18 U.S.C. § 922(c); 27 C.F.R. § 478.96(b). Accordingly, the Orders categorically bar the ability of individuals to lawfully acquire a firearm in New Mexico.

## II.   INJURY TO THE PLAINTIFFS

Plaintiff Robert Aragon would like to purchase a firearm and ammunition for self-defense purposes. *Declaration of Robert Aragon* ¶9. Plaintiff Aragon is not prohibited from possessing firearms under state or federal law. (*Id*. ¶4). Due to Defendants' Orders and enforcement actions, however, he is unable to purchase a firearm and ammunition or utilize a range to maintain proficiency with a firearm. (*Id*. ¶¶ 5–12). Plaintiff Aragon cannot purchase a firearm except through a licensed firearms dealer under New Mexico law. (*Id*. ¶6).

Plaintiff David Anthony Segura would like to purchase a firearm and ammunition for self-defense purposes. *Declaration of David Anthony Segura* ¶8. Plaintiff Segura is not prohibited from possessing firearms under state or federal law. (*Id*. ¶4). Plaintiff Segura cannot purchase a firearm except through a licensed

firearms dealer under New Mexico law. (*Id*. ¶6). Furthermore, Plaintiff Segura is a licensed firearms instructor in the State of New Mexico and teaches several courses required to receive a concealed handgun license. (*Id*. ¶13). Due to Defendants' Orders and enforcement actions, however, he is unable to purchase a firearm and ammunition or utilize a range to maintain proficiency with a firearm or to teach courses required to receive a concealed handgun license. (*Id*. ¶¶5–17).

Plaintiff Zachary Fort would like to purchase a firearm and ammunition for self-defense purposes. *Declaration of Zachary Fort* ¶9. Plaintiff Fort is not prohibited from possessing firearms under state or federal law. (*Id*. ¶4). Due to Defendants' Orders and enforcement actions, however, he is unable to purchase a firearm and ammunition or utilize a range to maintain proficiency with a firearm. (*Id*. ¶¶5–10). Plaintiff Fort cannot purchase a firearm except through a licensed firearms dealer under New Mexico law. (*Id*. ¶6). Furthermore, Plaintiff Fort is unable to renew his concealed handgun license, despite being eligible, due to Defendants' Orders and enforcement actions. (*Id*. ¶11–13). Without a concealed carry license, Plaintiff Fort is prohibited from carrying a firearm, in any manner, in any retailer, including grocery stores, gasoline stations, and convenience store, that sells but does not serve liquor for consumption. (*Id*. ¶14–17).

Plaintiff Rose's Guns & More, LLC ("Rose's Guns") would continue to engage in the business of lawfully purchasing, selling, and transferring firearms, but

for Defendants' Orders and enforcement actions. *Declaration of Elizabeth Rose Jantz* ¶20. In order to purchase a firearm in New Mexico, absent a few minor exceptions, individuals must appear in person at a licensed dealer to conduct the sale or transfer of a firearm. (*Id.* ¶8). Individuals from Rose's Guns contacted representatives from the Governor's Office; the New Mexico Attorney General's Office; the Mayor of Moriarty, New Mexico's Office; the New Mexico State Police; State Senator James P. White's Office; and the Moriarty City Police to determine whether Rose's Guns could operate under Defendants' Orders and were told that it was a non-essential business and must close. (*Id.* ¶¶9–16).

Plaintiff Southwest Gunsmith Technologies, LLC, ("Southwest Gunsmith"), and its principle Richard Kennedy, would open and engage in the transfer and repair of arms but for Defendants' Orders and enforcement actions. *Declaration of Richard Kennedy* ¶¶1, 5, 14. In order for Southwest Gunsmith to take possession of client's firearms for repair, renovation, service, etc., they must appear in person at MAGS Indoor Shooting Range ("MAGS") to deliver the firearm, where Southwest Gunsmith rents a retail space. (*Id.* ¶6, 8, 13). The New Mexico Department of Public Safety visited MAGS to tell the business it must close or it would be subject to a $60,000 fine. (*Id.* ¶9). As a result, Southwest Gunsmith was forced to cease operations. (*Id.* ¶10).

Violations of the Orders are misdemeanor offenses punishable by fines up to $100, six months in prison, or both. N.M. Stat. § 24-1-21. The Emergency Order states "[t]he New Mexico Department of Public Safety, the New Mexico Department of Homeland Security and Emergency Management, the Department of the Environment, and all other State departments and agencies are authorized to take all appropriate steps to ensure compliance with this Order." Thus, under Defendants' Orders and enforcement policies, it is a crime for individuals to leave their homes and go to firearms retailers, ranges, and repair facilities. Additionally, it is a crime for retailers, ranges, and repair facilities, including Plaintiffs herein, to operate.

In addition, Plaintiffs New Mexico Shooting Sports Association ("NMSSA"), the National Rifle Association of America ("NRA"), Second Amendment Foundation ("SAF"), and Firearms Policy Coalition, Inc. ("FPC"), are themselves damaged by Defendants' Orders and enforcement actions. Beyond their own direct damages, these institutional plaintiffs have members and supporters in New Mexico who are injured by Defendants' Orders and enforcement actions. *See Declarations of Zachary Fort, Alan Gottlieb, Josh Savani, and Brandon Combs*. Accordingly, all Plaintiffs seek this necessary relief.

**ARGUMENT**

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the

absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008) (collecting authorities); *Dine Citizens Against Ruining Our Env't v. Jewell,* 839 F.3d 1276, 1281 (10th Cir. 2016) (citation omitted).[6]

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

Plaintiffs will succeed on the merits of their claims. Defendants' Orders and enforcement actions prohibit all New Mexicans from exercising their natural and fundamental rights guaranteed by the Second Amendment. To establish a likelihood of success on the merits, the plaintiff "must make 'a prima facie case showing a reasonable probability that he will ultimately be entitled to the relief sought.'" *Logan v. Pub. Employees Ret. Ass'n*, 163 F. Supp. 3d 1007, 1026 n.6 (D.N.M. 2016) (collecting authorities). Additionally, the Tenth Circuit has held that if a plaintiff can establish that irreparable harm, equities, and the public interest tip strongly in his favor, then the likelihood of success prong is modified, and the plaintiff merely has to show "that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1255–56 (10th

---

[6] "The requirements for a TRO issuance are essentially the same as those for a preliminary injunction order." *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.,* 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018) (citations omitted). Accordingly, Plaintiffs brief the TRO and preliminary injunction factors together.

Cir. 2003) (quotations and citations omitted). The loss of a constitutionally protected right—"even for minimal periods of time"—"unquestionably constitutes irreparable injury" and the balance of equities and public interest always favor upholding the Constitution. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (quotations and citations omitted).

In *Heller*, the Supreme Court struck down the District of Columbia's ban on possessing operable handguns in the home. 554 U.S. at 628–29 (holding that the ban would "fail constitutional muster" under "any of the standards of scrutiny we have applied to enumerated constitutional rights"). Two years later, the Supreme Court held that the Second Amendment applies to the states by virtue of the Fourteenth Amendment because "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010) (plurality opinion).

The Tenth Circuit has since "adopted a 'two-pronged approach' to Second Amendment claims." *Peterson v. Martinez*, 707 F.3d 1197, 1208 (10th Cir. 2013) (quoting *United States v. Reese,* 627 F.3d 792 (10th Cir. 2010)). The court must first "ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id*. (quoting *Reese,* 627 F.3d at 800). "If the law does not impose a burden, it is constitutional." *Id*. "If it does, then the

court 'must evaluate the law under some form of means-end scrutiny.'" *Id.* (quoting *Reese,* 627 F.3d at 801).[7] Here, Defendants' Orders undoubtedly pose such a burden—there can be no right to "keep" or "bear" arms without the ability to acquire them and the ammunition that is essential to their use. Moreover, the right to keep arms includes the corresponding right to maintain proficiency in their use. *Heller*, 554 U.S. at 617–18 (2008) (citation omitted); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). Defendants' Orders' completely prohibit the right to acquire arms and ammunition as well as train with them at a shooting range. This categorical ban is unconstitutional.

### A.     *Defendants' Orders Strike at the Core Protections of the Second Amendment*

The Tenth Circuit reaffirmed that "the core purpose of the [Second Amendment] was to allow 'law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Reese*, 627 F.3d at 800 (quoting *Heller,* 554 U.S. at 635). The Second Amendment takes "off the table" any "absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 616, 636. The right to keep arms necessarily includes the right to "lawfully . . . *acquire* and keep a firearm."

---

[7] Notably, the Supreme Court rejected the application of means-end scrutiny in *Heller* to Second Amendment challenges and instead imposed a text, history, and tradition approach. *See Heller,* 554 U.S. at 634–35. In the interest of judicial efficiency, Plaintiffs reserve that argument and proceed with the Tenth Circuit's analysis framework.

*Peterson*, 707 F.3d at 1219 (Lucero, J., concurring) (quoting *Heller v. D.C.,* 670 F.3d 1244, 1255 (D.C. Cir. 2011)) (emphasis added). The "right to acquire a firearm" is the "most fundamental prerequisite of legal gun ownership." *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930, 938 (N.D. Ill. 2014). That has been the law in this country for a century and a half. *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them . . . and to purchase and provide ammunition suitable for such arms."). "[P]rohibiting the commercial sale of firearms . . . would be untenable under *Heller*." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010). It is undeniable that closing lawful firearm retailers falls within the core protections of the Second Amendment, for the right to keep and bear arms is meaningless without a manner in which to access the very instruments needed to exercise the right.

The right to acquire ammunition is also protected at the core of the Second Amendment. "[W]ithout bullets, the right to bear arms would be meaningless." *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014). "'[T]he right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them." *Id.* (citation omitted); *see also Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1117 (S.D. Cal. 2017), *aff'd*, 742 Fed. App'x 218 (9th Cir. 2018) ("Without protection for the closely related right to keep and bear ammunition magazines for use with the arms designed to use such magazines, 'the Second

Amendment would be toothless.'" (citation omitted)). Defendants' shuttering of firearm retailers denies Plaintiffs the ability to acquire firearms and ammunition and thus violates Plaintiffs' natural and fundamental right to keep and bear arms.

Moreover, there is a corresponding right to develop and maintain proficiency in the use of arms. The Supreme Court noted that "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them[;] . . . it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." *Heller*, 554 U.S. at 617–18 (quotation and citation omitted); *Ezell*, 651 F.3d at 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective."). In *Ezell*, the Seventh Circuit preliminary enjoined the City of Chicago from enforcing an ordinance that banned shooting ranges, while simultaneously requiring those who wished to exercise their Second Amendment protected rights to first undergo training at a range. 651 F.3d at 690. Defendants have done the same here; the forced closure of shooting ranges—while simultaneously requiring citizens to complete live-fire training to acquire a carry permit—categorically infringes upon Plaintiffs' rights to develop and maintain proficiency in the use of their arms.

COVID-19 does not diminish the scope of the Second Amendment or any other constitutionally protected right. The Second Amendment "is part of 'a

constitution intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs.'" *Youngstown Sheet & Tube*, 343 U.S. at 661 (Clark, J., concurring) (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819)); *see Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinksi, J., dissenting from denial of rehearing *en banc*) ("The Second Amendment is a doomsday provision."). Indeed, the Supreme Court stated that '"[t]he imperative necessity for safeguarding these rights . . . under the gravest of emergencies has existed throughout our constitutional history, for it is then, under the pressing exigencies of crisis, that there is the greatest temptation to dispense with fundamental constitutional guarantees which, it is feared, will inhibit governmental action."' *Hamdi v. Rumsfeld*, 542 U.S. 507, 532 (2004) (quoting *Kennedy v. Mendoza—Martinez,* 372 U.S. 144, 164–65 (1963)).

Here, regardless of their motivation, Defendants have completely prohibited the exercise of a natural, fundamental right. The right to keep and bear arms was memorialized in the Constitution to ensure that it would be preserved for future generations—especially in uncertain times.  Defendants' forced closure of firearm retailers, ranges, and repair facilities completely infringes upon Individual Plaintiffs' right to keep and bear arms; it prohibits them from acquiring arms and ammunition, repairing firearms to an operable status, and training with those arms. Additionally, by closing ranges, Defendants have made it impossible for New Mexicans to

lawfully acquire or renew a concealed handgun license because they cannot complete the live shooting requirement—thereby prohibiting New Mexicans from carrying a firearm, in any manner, in any retailer, including grocery stores, gasoline stations, and convenience store, that sells but does not serve liquor for consumption. Defendants' Orders bar constitutionally protected rights, activities, and business, all of which strike at the core of the Second Amendment's protections.

### B. Defendants' Orders Are a Complete Prohibition on Certain Second Amendment Protected Rights and Categorically Unconstitutional

In *Heller,* the Supreme Court first looked to the text of the Constitution itself and then to history and tradition to inform the scope and meaning of that text. Indeed, *Heller* held a handgun ban—which is narrower than the effect of Defendants' expansive Orders and actions—to be categorically unconstitutional: "Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629. "Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional." *Ezell*, 651 F.3d at 703 (emphasis added).

At issue here is a complete and unilateral suspension on the right of ordinary citizens to acquire firearms and from developing and maintaining proficiency in their use. Defendants' Orders go further than just banning the commercial sale of firearms

and ammunition—they also ban private transfers. Under New Mexico Law, it is a misdemeanor offense for two people to transfer a firearm between themselves, without having a licensed dealer conduct a federal instant criminal background check. N.M. Stat. §§ 30-7-7.1(A), (G). None of the exemptions to the law apply to the Individual Plaintiffs in this case. N.M. Stat. § 30-7-7.1(B). And with limited exceptions, transfers of firearms through a licensed dealer must be conducted in person. 18 U.S.C. § 922(c); 27 C.F.R. § 478.96(b). Defendants' Orders' application to firearm retailers have effectively banned firearms transfers within the state.

Infringements on the "core protection" of the Second Amendment must be held categorically unconstitutional, not "subjected to a freestanding 'interest-balancing' approach." *Heller,* 554 U.S. at 634–35. The Second Amendment "is the very *product* of an interest balancing by the people." *Id.* at 635 (emphasis in original). And "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634 (emphasis in original); *McDonald*, 461 U.S. at 785 (*Heller* "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing."); *Marzzarella*, 614 F.3d at 92 n.8 ("prohibiting the commercial sale of firearms . . . would be untenable under *Heller*.").

Plaintiffs are prohibited from exercising their Second Amendment protected rights, at a time when those rights are most important. Worse, anyone who does not already own a firearm in New Mexico is now almost certainly completely prohibited from acquiring constitutionally protected property to defend themselves. As such, Defendants' Orders amount to a categorical ban and should be categorically stricken.

### C.   *Defendants' Orders Fail to Pass Constitutional Muster under any Level of Scrutiny*

Defendants' Orders and actions are also unconstitutional under the Tenth Circuit's two-part tiered-scrutiny test. "First, we 'ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.' If the law does not impose a burden, it is constitutional. If it does, then the court 'must evaluate the law under some form of means-end scrutiny.'" *Peterson*, 707 F.3d at 1208 (internal citations omitted). "[T]he core purpose of the [Second Amendment is] to allow 'law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Reese*, 627 F.3d at 800 (quoting *Heller*, 554 U.S. at 635); *Peterson*, 707 F.3d at 1218 (Lucero, J., concurring).

As explained in detail above, Defendants' Orders strike at the core of the Second Amendment, and strict scrutiny should apply. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973) ("[S]trict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution.").

18

Emergencies do not lessen the level of judicial scrutiny. The need to protect rights is greatest during a crisis, *Hamdi*, 542 U.S. at 532, which is why other courts have applied strict scrutiny to firearms restrictions during declarations of emergencies. *See Bateman v. Perdue*, 881 F. Supp. 2d 709, 715 (E.D.N.C. 2012) (following Fourth Circuit precedent to apply strict scrutiny to a "core" Second Amendment analysis, but not applying *Heller*'s categorically unconstitutional analysis). The *Bateman* Court ruled that strict scrutiny was the appropriate standard of review because "[m]ost significantly, [the restriction] prohibits law abiding citizens from purchasing and transporting to their homes firearms and ammunition needed for self-defense." *Id*. The Court should therefore apply strict scrutiny over any lower forms of scrutiny here.

Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett,* 564 U.S. 721, 734 (2011) (citations and quotations omitted).[8]

Recitation of a compelling interest is not enough to satisfy the first prong of strict scrutiny. Rather, the interest must actually be furthered by the Orders.

---

[8] Although the Plaintiff bears the burden of showing that he is likely to succeed on the merits, "burdens at the preliminary injunction stage track the burdens at trial." *Awad v. Ziriax*, 670 F.3d 1111, 1129 (10th Cir. 2012) (citation omitted). Defendants therefore bear the burden here. *Id*.

Defendants "must demonstrate that the recited harms are real, not merely conjectural, *and* that *the regulation will in fact alleviate these harms in a direct and material way*." *Awad*, 670 F.3d at 1129–30 (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 644 (1994) (plurality)) (emphasis added).

Defendants cannot demonstrate that closing firearm retailers, ranges, or repair facilities will directly or materially alleviate the harms posed by COVID-19. Any alleviation of the spread of COVID-19 from closing firearm retailers is speculative, at best. Further, all Plaintiffs have affirmatively stated that they would abide by all social distancing and workforce requirements for the operation of essential businesses. Accordingly, Defendants cannot demonstrate that the closure of retail firearms businesses and shooting ranges *furthers* a compelling interest.

Moreover, the closure of all firearm retailers, ranges, and repair facilities constitutes a complete ban that is not narrowly tailored, as a matter of law. The Tenth Circuit made it clear: A "complete ban of Sharia law is hardly an exercise of narrow tailoring." *Awad*, 670 F.3d at 1131; *see also Heller*, 554 U.S. at 635 (comparing the Second Amendment to the First Amendment). The *Bateman* court emphasized the same problem with North Carolina's emergency-declaration statute that prohibited citizens from lawfully acquiring a firearm during an emergency—the statute was not tailored in any manner whatsoever, let alone narrowly. 881 F. Supp. 2d at 716. The statute did not "target dangerous individuals or dangerous conduct." *Id*. It did not

"impose reasonable time, place and manner restrictions" like a "curfew to allow the exercise of Second Amendment rights during circumscribed times." *Id*. The statute "excessively intrude[d] upon plaintiffs' Second Amendment rights by effectively banning them (and the public at large) from engaging in conduct that is at the very core of the Second Amendment at a time when the need for self-defense may be at its very greatest." *Id*. (citing *Heller*, 554 U.S. at 795). Defendants' Orders are indistinguishable from the orders in *Bateman*—they effectively destroy the right to keep and bear arms, and a categorical ban is never narrowly tailored. Defendants' Orders cannot survive strict scrutiny.

Even if this Court concludes that only intermediate scrutiny applies, Defendants' Orders still do not pass constitutional muster.[9] "To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *Reese*, 627 F.3d at 802 (quoting *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010)). Intermediate scrutiny further demands that restrictions of constitutionally protected conduct must be "narrowly tailored" and possess a "close fit between ends and means." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). "'[T]he essence of narrow tailoring' is . . . 'focus[ing] on

---

[9] The Supreme Court held that the Second Amendment is not subject to "rational basis" review. *Heller,* 554 U.S. at 628 n.27. Therefore, Plaintiffs' challenge must at least be resolved under intermediate scrutiny.

the source of the evils the [government] seeks to eliminate . . . without at the same time banning or significantly restricting a substantial quantity of speech [or conduct] that does not create the same evils.'" *Golan v. Holder*, 609 F.3d 1076, 1083 (10th Cir. 2010) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 800 n.7 (1989)) (some alterations in original). In other words, "when 'the burden imposed by [a regulation] is congruent to the benefits it affords,' that regulation is narrowly tailored." *Id*. (quoting *Turner Broad. Sys., Inc.,* 520 U.S. at 215–16) (alteration in original). To carry this burden, the government must not only present evidence, but "substantial evidence" drawn from "reasonable inferences" that actually support its proffered justification. *Turner Broad. Sys., Inc.*, 520 U.S. at 195 (1997).

Again, and as described in more detail above, Defendants' Orders are not narrowly tailored. They completely prohibit the exercise of rights protected by the core of the Second Amendment—the right to keep and bear arms for self-defense, to acquire arms and ammunition, to develop and maintain proficieny with arms, and to maintain the functionality of arms—while only having speculative effects on COVID-19. Defendants' Orders must be stricken under intermediate scrutiny.

## II.    DEFENDANTS' BAR ON THE EXERCISE OF PLAINTIFFS' CONSTITUTIONALLY PROTECTED RIGHTS CONSTITUTES IRREPARABLE INJURY

The violation of a constitutionally protected right, without more, is an irreparable harm. *Elrod v. Burns* 427 U.S. 347, 373 (1976) ("The loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). The Tenth Circuit has upheld this principal for a spectrum of rights. *Hobby Lobby Stores, Inc.*, 723 F.3d at 1145 (religion) (quoting *Heideman v. S. Salt Lake City,* 348 F.3d 1182, 1190 (10th Cir. 2003) (speech)); *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) (voting) (citation omitted).

The same standard applies to violations of Second Amendment protected rights. The Supreme Court made it clear that the Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights." *McDonald,* 561 U.S. at 780. Both the Seventh and D.C. Circuits have held that a plaintiff suffers an irreparable injury when he is denied his Second Amendment protected rights. *Ezell*, 651 F.3d at 699; *Wrenn v. D.C.*, 864 F.3d 650, 667 (D.C. Cir. 2017).

As demonstrated above, Defendants' Orders completely prohibit Plaintiffs from exercising their Second Amendment protected rights and from engaging in constitutionally protected conduct. Under state and federal law, Plaintiffs cannot exercise their natural and fundamental right to keep and bear arms without lawfully operating firearm retailers to sell and transfer arms, ranges to allow training to become proficient and maintain proficiency, and repair facilities to process and transfer arms that need service. Defendants' Orders wholly and completely infringe

upon Plaintiffs' constitutionally protected rights and liberties. Accordingly, Plaintiffs here are irreparably harmed.

## III.    THE BALANCE OF EQUITIES WEIGHS IN PLAINTIFFS' FAVOR

"When a constitutional right hangs in the balance, though, 'even a temporary loss' usually trumps any harm to the defendant." *Free the Nipple-Fort Collins*, 916 F.3d at 806 (citation omitted) (affirming the trial court's holding that the loss of a constitutional right outweighs the "public's interest in morality"). Indeed, in *Free the Nipple,* the Tenth Circuit held that '"being required to wait to bare their breasts in public' deprives the Plaintiffs of a constitutional right, while the City has no interest in keeping an unconstitutional law on the books." *Id.*

Just as the harm to women forced to '"wait to bare their breasts in public,"' *id.*, outweighed any interest the government had in enforcing an unconstitutional law, there can be no question that the harm to Plaintiffs here—being deprived of the ability to keep, bear, acquire, sell, transfer, possess, train with, and/or transport a firearm to defend themselves in their homes—must also outweigh Defendants' interests here. There can be no question Plaintiffs' inability to exercise their constitutionally protected rights, in a time such as this, outweighs Defendants' interest in enforcing an unconstitutional Order that fails to consider firearm retailers, ranges, and repair facilities as one of the many "essential businesses."

## IV.    GRANTING AN INJUNCTION IS IN THE PUBLIC'S INTEREST

Granting Plaintiffs' Motion and entering a preliminary injunction here is in the public's interest. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc.*, 723 F.3d at 1147 (quoting *Awad*, 670 F.3d at 1132); *Free the Nipple-Fort Collins*, 916 F.3d at 807 (same). Second Amendment protected rights are no different—the Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights." *McDonald, Ill.,* 561 U.S. at 780. Therefore, granting the injunction serves the public's interest.

The government does not have any interest in enforcing an unconstitutional Order. The Supreme Court has repeatedly warned that "It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties . . . which makes the defense of the Nation worthwhile." *Hamdi*, 542 U.S. at 532 (quoting *United States v. Robel,* 389 U.S. 258, 264 (1967) (alteration in original)). If the interest in national defense is not strong enough to justify the suspension of a fundamental constitutional right, then neither is COVID-19. Granting the injunction therefore serves the public's interest.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction.

DATED this 15th day of April 2020.

Respectfully Submitted,

_/s/Patrick J. Rogers_
Patrick J. Rogers
Patrick J. Rogers, LLC
20 First Plaza NW, Suite 725
Albuquerque, NM  87102
(505) 938-3335
patrogers@patrogerslaw.com

Cody J. Wisniewski*
*Pro Hac Vice App. Forthcoming*
Mountain States
  Legal Foundation
2596 S. Lewis Way
Lakewood, CO  80227
(303) 292-2021
cody@mslegal.org

Adam Kraut, Esq.*
*Pro Hac Vice App. Forthcoming*
Firearms Policy Coalition, Inc.
1215 K Street, 17th Floor
Sacramento, CA  95814
(916) 476-2342
akraut@fpclaw.org

Michael T. Jean*
*Pro Hac Vice App. Forthcoming*
The National Rifle
  Association of America
11250 Waples Mill Road
Fairfax, VA  22030
(703) 267-1158
mjean@nrahq.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Patrick J. Rogers, CERTIFY that, on April 16, 2020, I filed the foregoing using CM/ECF, which causes the parties of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/Patrick J. Rogers*